IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2017 Session

## STATE OF TENNESSEE v. JOSE ORTIZ

**Appeal from the Circuit Court for Montgomery County**
No. 41301368      Jill Bartee Ayers, Judge

_____

### No. M2016-02457-CCA-R3-CD
_____

The Appellant, Jose Ortiz, was convicted of child abuse and aggravated sexual battery. The trial court imposed a total effective sentence of eight years in the Tennessee Department of Correction. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his convictions and contends that "to enable reasonable appellate review[, this] court must establish a standard of performance for the trial court to satisfy its duty as the thirteenth juror." Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

Patrick T. McNally, Nashville, Tennessee (on appeal), and Chase Smith, Clarksville, Tennessee (at trial), for the Appellant, Jose Ortiz.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; John Wesley Carney, Jr., District Attorney General; and Kimberly Lund, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### I. Factual Background

A Montgomery County Grand Jury returned a multi-count indictment against the Appellant, charging him with two counts of rape of a child and two counts of aggravated sexual battery. The victim of the offenses was his eleven-year-old stepdaughter, I.Z.[1] On

---

[1] It is the policy of this court to refer to minor victims by their initials.

the day of trial, the State dismissed one of the rape of a child counts and one of the aggravated sexual battery counts.

At trial, the victim testified that she was born on February 23, 2002, and that she was thirteen years old at the time of her testimony. At the time of the offense, the Appellant was her stepfather, and she had called him "Dad."

The victim said that on the day of the offense, she, her two younger siblings, and the Appellant took her mother to work at a Mexican restaurant and then returned home. While her younger siblings were in the living room watching television, the victim went into the kitchen to make a sandwich. The Appellant came into the kitchen, stood behind her, and grabbed her "front [private] part and [her] back [private] part" over her clothes. She explained that her private parts were the parts covered by her underwear. She said that being grabbed by the Appellant felt "[w]eird." After the Appellant grabbed her, he started moving; the victim demonstrated the movements for the jury.[2] The Appellant stopped touching her, but the victim did not know why he stopped. She did not recall the Appellant saying anything to her.

The victim then took her sandwich to her room and later returned the empty plate to the kitchen. As she was walking back to her room, the Appellant pushed her into her mother's bedroom and onto the bed. The victim said that the Appellant got on top of her and kissed and sucked her neck, which caused a "hickey." He pulled down her sweatpants and underwear, then he grabbed her front private part. The State asked if the Appellant touched the inside or outside of the victim's front private part, and the victim responded, "Kind of both." When she was asked to explain further, the victim replied, "Like – like almost there but like not really into there." The victim stated that "[i]t kinda hurt" on the inside. The victim said that neither she nor the Appellant spoke during the incident. She thought the Appellant stopped because it was almost time to pick up her mother from work.

The victim said the Appellant decided they should go to Walmart to buy something to conceal the hickey on her neck from her mother. The Appellant told the victim not to tell her mother about the hickey but, if her mother noticed the mark, to say her sister hit her with a shoe. Afterward, the victim was afraid of the Appellant and stayed away from him. The victim said that after her mother saw the mark on her neck, she told her mother what the Appellant had done.

On cross-examination, the victim said that she was born in Mexico, that the Appellant brought her and her mother to America, and that she and her mother had lived with the Appellant for several years. The Appellant and the victim's mother had a son

---

[2] The transcript did not describe the movements.

and a daughter together, and the Appellant had two older sons who had lived with them for a while. The victim said she and the Appellant had been close, but she did not know if her mother was jealous of their relationship.

The victim did not recall going to a Hastings store on the day of the offense; however, she recalled that the Appellant took her to Walmart that evening to buy makeup to conceal the mark on her neck. The victim acknowledged that her hair was long and that it was in a ponytail while she was in Walmart, thus exposing the mark on her neck. When she, the other children, and the Appellant returned home, he applied makeup to her neck to conceal the mark. Later, they went to pick up her mother. Her mother worked only on Sundays and got off work around 9:00 or 10:00 p.m. The victim acknowledged that her mother had threatened to send her to Mexico and that she was afraid of her mother. The victim acknowledged that the Appellant taught her to speak English because her mother did not speak English.

The victim thought she may have taken a shower after the incident. She could not recall how she wore her hair to school the next day. She recalled that when she came home from school around 3:00 or 4:00 p.m., her mother told her to remove the scarf she was wearing around her neck. The victim complied, and her mother saw the mark on her neck. The victim's mother asked about the mark. The victim initially complied with the Appellant's instructions and told her mother that her sister had hit her with a shoe, causing the mark. However, when her mother said she did not believe her, the victim revealed what the Appellant had done.

The victim remembered seeing a doctor in Nashville after the incident. She denied telling the doctor that her sister had hit her with a shoe. She also denied telling the doctor that she had no complaints or concerns about her body. The victim said she told the doctor that the Appellant "pushed [her] into the kitchen and pinned [her] on the bed." The victim said that she told the doctor the Appellant pulled down her pants and underwear but acknowledged that she did not tell the doctor the Appellant had penetrated her digitally.

On redirect examination, the victim said she was eleven years old at the time of the incident. The victim stated that in addition to the doctor in Nashville, she talked with another person about the incident. The victim asserted that no one had threatened to deport her to Mexico if she did not testify at trial and that she was telling the truth.

Sue Ross, a pediatric nurse practitioner at the Our Kids Center (Our Kids) in Nashville, testified that at approximately 11:30 p.m. on November 4, 2013, she examined the victim in the emergency room at General Hospital; the victim's mother was not with the victim at the hospital. A social worker did the intake portion of the victim's

evaluation. Ross[3] reviewed the social worker's comments on the written report of the evaluation and discerned that the victim was not in any acute distress initially but that she became "somewhat anxious" as the interview progressed. Notably, when the victim was asked "about what got her to the hospital," the victim "began nervously hitting the top of her head, both of her legs started shaking and then [she] indicated that she could not talk about it." After the victim was "provided with support and reassurance and encouraged to take her time," she reported that around 2:00 p.m. the previous day, her stepfather had kissed her neck and that he had digital contact with the outside of her genitals under her clothes. Ross observed that many children had difficulty distinguishing between the inside and the outside of their genitals.

Ross said that during her examination of the victim, she found nothing out of the ordinary except a couple of bruises on the victim's neck that were consistent with "some sort of sucking or kissing action." Ross denied that the bruises were consistent with being hit by a shoe. Ross explained that she had not expected to find physical evidence of digital penetration.

On cross-examination, Ross acknowledged that according to the report, the victim did not say that the Appellant pushed her into a bedroom, that he pushed her onto a bed, that he got on top of her, or that he digitally penetrated her. Instead, the report reflected that the victim said the Appellant "came up behind her while she was making a sandwich and began kissing and sucking on her neck."

On redirect examination, Ross stated that even if the report did not reflect that the victim mentioned contact occurring in a location other than the kitchen, the contact may have occurred in other locations. She explained that the staff of Our Kids had no good reason to ask the victim where the contact occurred because such information was "irrelevant from a medical standpoint."

Brian Tenry testified that in 2013, he was a detective with the child sex abuse division of the Clarksville Police Department. He was assigned to investigate the victim's allegations against the Appellant. Detective Tenry interviewed the Appellant, and a copy of the recorded interview was played for the jury.

During the interview, the Appellant said that he was born in Mexico and had lived in the United States since he was nine years old. He acknowledged he had been arrested several times during his first divorce; however, he blamed all of the charges on his ex-wife. The Appellant maintained that he and his current wife, the victim's mother, were

---

[3] Presiding Judge John Everett Williams has taken the position that referring to witnesses by their last names, without common titles such as Mr. or Mrs., is disrespectful. However, in referring to witnesses without their titles, we mean no disrespect to the witnesses.

- 4 -

having problems and that she wanted him to get out of the house. The Appellant said that he met the victim's mother in Mexico when the victim was three years old. He stated that he was the only father the victim had ever known; however, when the victim's mother was angry with the victim, she threatened to send her to Mexico to live with her biological father.

The Appellant said that the victim's mother had a quick temper and was very jealous. They fought when he was late coming home from work, which sometimes resulted in his being charged with domestic violence. The Appellant said that the victim's mother had "whip[ped]" the victim for wrestling and playing with the Appellant and that she told the victim to "stay away from men." The victim's mother also had hit the victim in the face, causing her lip to bleed, and had whipped the victim with a belt.

The Appellant theorized that the victim had made the accusations against him because she was upset that he had refused to buy her an iPod. He explained that one Sunday after dropping off the victim's mother at work, he took the children to a Hastings store. While there, the victim found an iPod she wanted and asked the Appellant to buy it for her. He refused to buy it that day but suggested the iPod might be a possible Christmas present. The victim "threw a fit," and they had to go home.

After they returned home, the children stayed in the house while the Appellant mowed the yard. The Appellant's youngest daughter came outside crying and said the victim had been "kissing her all over too much." The Appellant said the victim loved to "aggravate" his daughter. He told his daughter to "punch" the victim "or something" to get her to stop. His daughter went back inside the house but returned when the victim continued to bother her. The Appellant advised her to hit the victim with her brother's shoe if the victim continued to bother her.

After the Appellant finished mowing, he went inside the house, changed into shorts and a t-shirt, and played with all three children before going into the kitchen to wash dishes and cook dinner. While he was washing dishes, the victim walked up behind him and pulled his pants down. The Appellant turned around, told the victim that she had gone "too far," and asked how she thought her mother would punish her. The victim became afraid and started crying. The Appellant comforted her and agreed not to tell her mother. The victim promised to be good.

The Appellant said that the following morning, the victim's mother called him to complain about "hickies" on the victim's neck and back. He said that when he got home, he saw a mark on the victim's shoulder blade, which matched the shape of his son's shoe. The Appellant opined the marks were probably caused by the shoe and by his beard rubbing against her neck as he "comforted" her after the scolding. The Appellant stated that the victim's skin was sensitive and bruised easily.

- 5 -

Detective Tenry told the Appellant that the marks on the victim's neck did not look like bruises caused by a shoe or by a beard but did look like hickies. The Appellant asked Detective Tenry to show him photographs of the marks, explaining that he had not looked at the marks closely because the victim's mother was yelling at him, and he had not wanted to be charged with domestic violence again. The Appellant also suggested the bruises were caused when the family was wrestling. The Appellant said that he and the victim's mother had not fought for approximately three weeks before this incident and that most of their fights were about money.

The Appellant agreed that he thought the victim wanted attention from him but denied that he thought she wanted the attention to be sexual. The Appellant said that the victim was a kid, was not developed, and had nothing a man would want to touch. He acknowledged that he might have been attracted to the victim if she had been "fully developed" and that the possibility of the attraction made him "nervous." The Appellant maintained that he and the victim were only in the kitchen or living room that day, were never in a bedroom or bathroom together, and were never alone that day.

After the interview finished playing, Detective Tenry testified that the Appellant never showed him the shoe that supposedly matched the bruise on the victim's shoulder.

Detective Tenry testified that during his investigation, he learned that immediately after the incident, the Appellant took the victim to Walmart to buy makeup to conceal the mark on her neck. Detective Tenry obtained security video from Walmart which showed the Appellant, the victim, and two younger children in the store. After the security video was played for the jury, Detective Tenry identified a still photograph taken from the video. The photograph showed the Appellant and the victim in the makeup aisle. The time stamp on the photograph was November 3, 2013, at 7:13 p.m.

Detective Tenry said that he obtained the victim's sexual assault kit from Ross, took buccal swabs from the inside of the Appellant's cheek, and transported the kit and swabs to the Tennessee Bureau of Investigation (TBI) for testing.

On cross-examination, Detective Tenry said that after he contacted the Appellant by telephone, the Appellant drove himself to the office to be interviewed. During the interview, the Appellant was calm and cooperative. When the interview was concluded, the Appellant was not placed under arrest and was allowed to leave.

Detective Tenry said that at some point, he went to the victim's house. The victim, her mother, and other small children were present, but the Appellant was not home. When asked if he had been asked to complete any paperwork regarding a "U visa"

for the victim, Detective Tenry acknowledged that he received a letter to sign to confirm that the victim was an "alleged victim of a crime."[4]

Laura Boos with the forensic biology unit of the TBI crime laboratory testified that she tested a swab from the victim's neck. The swab was included in the sexual assault kit. Her testing revealed that the sample on the swab "may actually contain the presence of saliva." However, the sample amount was "limited." Boos agreed that the victim's taking a shower before the sample was taken could explain why the sample was so small. DNA testing revealed a partial DNA profile consistent with a mixture of genetic material from two people. The "partial major contributor" matched the victim. The "limited minor male contributor was inconclusive due to insignificant or degraded DNA." Boos recommended that the sample be sent for Y-STR testing, which was not performed at the TBI crime laboratory, because the test "targets only male DNA."

Barbara Leal testified that on October 23, 2014, she was a forensic DNA analyst with Cellmark Forensics, a private DNA testing laboratory located in Dallas, Texas. She was asked to perform Y-STR testing on buccal swabs from the victim and the Appellant and a neck swab from the victim. The testing revealed that the Appellant "could not be excluded as a contributor of the male DNA detected from" the sample found on the neck swab. Leal explained that Y chromosomes were passed unchanged from father to son; therefore, anyone in the Appellant's paternal line, such as his sons, could not be excluded as a contributor of the sample. She checked the partial profile found on the neck swab against "the US Y-STR database," which "consists of thousands of males of different population groups." She stated that "[f]or the Hispanic population, at most you would expect to see that partial profile would be one in 20 Hispanic males, but that also means that 94.9 percent of those males would not have that profile or would be excluded."

The forty-seven-year-old Appellant testified that he had been an aircraft mechanic for approximately seventeen years. The Appellant said that he had lived in Clarksville for almost twenty-two years and that he was a legal resident of the United States. He had two older children from a previous marriage. At the time of trial, the Appellant and the victim's mother were going through a divorce.

The Appellant met the victim's mother on one of his infrequent trips to Mexico when the victim was three years old. The Appellant and the victim's mother had "a good chemistry," and they got married. Before the Appellant secured a legal means of entry into the United States for the victim and her mother, they attempted to enter the country

---

[4] During opening statements, defense counsel stated that according to federal law, an immigrant victim of sexual assault or other violent crime may qualify for a "U Visa," which would allow the immigrant to remain in the country for four years and apply for a green card after three years. Defense counsel contended that "if you're illegal this is the easiest way to go from illegal to protected status for four-years and then eventually to a green card. Simple. That's what this [case] is about."

illegally. Although the victim's mother was successful, the victim was not. The Appellant said that he spent almost $10,000 to find the victim and bring her into the United States illegally.

The Appellant said that he and the victim's mother had two children together. Initially, the victim's mother had a good relationship with his older children but later she began having trouble getting along with them. She was "very strict" and had a quick temper. She sometimes spanked the victim for no reason and threatened to send the victim to live with her grandmother or "real father" in Mexico.

The Appellant recalled that before the incident, he and the victim's mother argued because he was going to Mexico for a short time to care for his ailing father. The victim's mother objected to the visit and his paying for his father's medical expenses. During the argument, the Appellant threatened to divorce the victim's mother and said he would not help her obtain a "green card." After the Appellant returned from Mexico, the victim's mother did not speak to him for six months, and they stopped sleeping in the same bed.

The Appellant said the victim was a "sweet little girl" who "needed a father figure." He described their relationship as close, noting that he taught her English, helped her with her school work, loved her, and treated her like his own daughter. As the victim aged, her mother became jealous of the victim's relationship with the Appellant and "didn't want [the victim] to get close to [the Appellant] or kiss [him] or anything like that."

The Appellant said that the victim's mother worked only on Sundays from 1:00 p.m. to 10:00 p.m. On Sunday, November 3, 2013, after driving the victim's mother to work, the Appellant, the victim, and his two youngest children went to a Hastings store. While in the store, the victim asked the Appellant to buy her an iPod. The Appellant told her it was too expensive but suggested she ask for the iPod for Christmas. The victim "threw a fit. Like I never seen before." The Appellant was embarrassed, and he "drag[ged]" the victim out of the store and took everyone home.

After they returned home, the Appellant began mowing the yard while the children stayed in the house. While he was mowing, his son came outside and said the victim was bothering him by pulling down his pants and kissing him all over. The Appellant told his son to tell the victim to stop, and his son went back inside the house. About fifteen minutes later, his daughter came outside crying because the victim had been bothering her by kissing her and pulling down her pants. The Appellant told his daughter to hit the victim with a shoe, and his daughter went back inside the house.

After the Appellant finished mowing, he went inside the house and "calmed everybody down." He changed into a t-shirt and shorts then went into the living room to play and wrestle with his son. The victim, who had gone into her room because she was upset about the incident at the store, came out of her room and wanted to play with them. The Appellant cautioned that the victim's mother would be mad if she discovered the victim had been playing with them, but he allowed her to play in order to soothe her hurt feelings.

After a while, the Appellant went into the kitchen to wash dishes and cook. The victim continued to "bother[]" her younger siblings in the living room, so the Appellant told her to go to her room. However, while the Appellant was washing dishes, the victim came up behind him and pulled down his shorts. The Appellant pulled up his shorts, grabbed the victim's arms, and told her, "[W]e don't play like this; you just – this is off limits; what you did, it – you just don't do that." He asked her to imagine her mother's reaction if she learned what the victim had done. The victim became frightened and asked the Appellant not to tell her mother. He agreed and told the victim to go to her room. Thereafter, the Appellant cooked dinner and the family ate and watched television.

The Appellant explained that around 7:00 or 7:30 p.m., the victim went to the bathroom and saw she had a mark on her shoulder blade. She came to the Appellant, crying and saying that her mother would hit her if she saw the mark. The Appellant assured the victim that they would go to Walmart and buy makeup to conceal the mark. Upon returning home from Walmart, the Appellant applied the makeup to the mark. Around 10:00 p.m., the family picked up the victim's mother from work. When they got home, the children went to bed.

The next morning, the victim's mother got the victim ready for school. That afternoon, the Appellant learned the victim had made allegations against him. The Appellant denied that he had kissed or sucked the victim's neck, touched the victim's breast or vagina, pushed her into her mother's room, pinned her to the bed, removed her panties, or digitally penetrated her. The Appellant maintained that the allegations were made because the victim and her mother needed a "U visa" to stay in the United States.

On cross-examination, the Appellant said that the argument he and the victim's mother had about his father and a divorce occurred at the end of February 2013. However, their divorce proceedings did not begin until 2014. The Appellant acknowledged that in November 2013, his two oldest sons were not living with him.

The Appellant conceded that he was not truthful when he told Detective Tenry that his relationship with the victim's mother was "normal," explaining that "after the fight we just didn't get along." He said he did not tell Detective Tenry about his marital problems because he "felt like that was not really any of [the detective's] business; you

know, that was more personal and more intimate." The Appellant acknowledged that he told Detective Tenry the victim was bothering his daughter on the day in question but did not mention that the victim also bothered his son because Detective Tenry "didn't ask" and because the Appellant did not think it was an important detail.

The Appellant said the victim noticed a mark on her neck after he wrestled with the children. The Appellant recalled that on the afternoon of November 4, the victim's mother called him because she was upset about marks on the victim. The Appellant told the victim's mother the marks were caused by a shoe, but she did not believe him. The Appellant also told Detective Tenry the mark on the victim's neck was caused when his daughter hit the victim with his son's tennis shoe, but he did not tell Detective Tenry that he bought makeup to conceal the mark. The Appellant acknowledged that he covered the mark with makeup because he was a "protective father" and "didn't want [the victim] to be hit" by her mother. The Appellant conceded that he did not discipline his daughter for hitting the victim. The Appellant maintained that he did not know how his DNA got on the victim's neck and that he was "shocked and surprised" by the test results. He surmised that his DNA may have gotten on the victim's neck when the family was wrestling.

At the conclusion of the proof, the jury found the Appellant not guilty of rape of a child but guilty of the lesser-included offense of child abuse. The jury convicted the Appellant of aggravated sexual battery as charged. The trial court imposed concurrent sentences of eleven months and twenty-nine days and eight years, respectively. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his convictions and contends that "to enable reasonable appellate review[, this] court must establish a standard of performance for the trial court to satisfy its duty as the thirteenth juror." We have chosen to address these issues in reverse order.

## II. Analysis

### A. Thirteenth Juror

The Appellant complains that no standard has been set for an appellate court's review of a trial court's ruling as a thirteenth juror. He posits that "cursory orders overruling a new trial motion provide no adequate record for review" by appellate courts. He complains that because the trial court in the instant case provided only a single, conclusory paragraph discharging its duty as thirteenth juror and did not explain how it weighed the credibility of the witnesses, the Appellant was deprived of "a meaningful opportunity to challenge the sufficiency of the evidence." The State responds that the trial court properly fulfilled its role as thirteenth juror and that further findings of fact were not required. We agree with the State.

"The thirteenth juror rule originated at common law and requires the trial court to independently weigh the evidence, pass upon the issues, and decide whether the verdict is supported by the evidence." State v. Moats, 906 S.W.2d 431, 433 (Tenn. 1995) (citing Curran v. State, 4 S.W.2d 957, 958 (Tenn. 1928)). The modern equivalent of the thirteenth juror rule, Tennessee Rule of Criminal Procedure 33(d), provides, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." The reasoning behind the rule is that "'[i]mmediately after the trial, the trial court judge is in the same position as the jury to evaluate the credibility of witnesses and assess the weight of the evidence, based upon the live trial proceedings.'" State v. Hall, 461 S.W.3d 469, 490 (Tenn. 2015) (quoting Moats, 906 S.W.2d at 434).

Our supreme court has explained that an assessment of the weight of the evidence is different from an assessment of the sufficiency of the evidence. State v. Ellis, 453 S.W.3d 889, 899 (Tenn. 2015). When assessing the sufficiency of the evidence, a reviewing court must view the evidence in the light most favorable to the State; however, when weighing the evidence, the trial court views the evidence like a juror, including determining the credibility of witnesses. Id. Notably, "a judge exercising thirteenth juror function, like a juror, is not required to give any reason for the action." State v. Dankworth, 919 S.W.2d 52, 58 (Tenn. Crim. App. 1995). Accordingly, "when the trial judge simply overrules a motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict." State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). "If the trial court gives reasons, 'an appellate court looks to them only for the purpose of determining whether [the trial court] passed upon the issue and was satisfied or dissatisfied with the verdict thereon.'" Dankworth, 919 S.W.2d at 58 (quoting Cumberland Telephone & Telegraph Company v. Smithwick, 79 S.W. 803, 805 (Tenn. 1904)).

Regarding the Appellant's claim that this court should establish a standard of review for a trial court's determination as a thirteenth juror, we note that our supreme court has explained that a trial court "is in a position to weigh the evidence because [it] was present for the testimony and so had an opportunity to determine credibility[; however] . . . an appellate judge's . . . review of the case is limited to the cold written record of the trial." State v. Stephens, 521 S.W.3d 718, 727 (Tenn. 2017). As such, "[a]ppellate courts are ill-suited . . . to assess whether the verdict is supported by the weight and credibility of the evidence[;] . . . [therefore,] the accuracy of a trial court's thirteenth juror determination is not a subject of appellate review." Moats, 906 S.W.2d at 435 (citing State v. Burlison, 868 S.W.2d 7143, 719 (Tenn. Crim. App. 1993)).

Next, we note the Appellant's contention that he was deprived of the opportunity to contest the sufficiency of the evidence under the thirteenth juror rule is disingenuous. It is well-established that once a trial court has approved the verdict as the thirteenth

- 11 -

juror, as it has in this case, our appellate review is limited to determining the sufficiency of the evidence. Burlison, 868 S.W.2d at 719. The Appellant also challenges the trial court's denial of his motion for a judgment of acquittal. "The standard for reviewing the denial . . . of a motion for judgment of acquittal is analogous to the standard employed when reviewing the sufficiency of the convicting evidence after a conviction has been imposed." State v. Robinson, 146 S.W.3d 469, 524 (Tenn. 2004) (appendix). Therefore, we will now turn to the Appellant's complaints regarding the sufficiency of the evidence.

## B. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

The Appellant was convicted of child abuse and aggravated sexual battery. Tennessee Code Annotated section 39-15-401(b) provides that it is a Class A misdemeanor for any person to knowingly abuse a child under eighteen years of age so as to adversely affect the child's health and welfare. Tennessee Code Annotated section 39-13-504(a)(4) provides that "[a]ggravated sexual battery is unlawful sexual contact with a victim by the defendant" when the victim "is less than thirteen (13) years of age." "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

- 12 -

The proof adduced at trial, taken in the light most favorable to the State, revealed that upon returning home after taking the victim's mother to work, the victim's siblings went into the living room to watch television, and the victim went into the kitchen. As the victim was making a sandwich, the Appellant stood behind her and touched her front and back private areas. The victim took the sandwich to her room and later returned the empty plate to the kitchen. While she was walking back to her room, the Appellant pushed her into her mother's bedroom and onto the bed. He kissed and sucked on her neck, causing hickies, then he pulled down her sweatpants and underwear. He touched "[k]ind of both" the inside and outside of her front private part, "like almost there but like not really into there." Later that evening, the Appellant took the victim and her siblings to Walmart and bought makeup to conceal the marks on her neck. After the victim told her mother about the incident, the victim was examined by Ross, a pediatric nurse at Our Kids. Ross took a swab from the victim's neck, which tested positive for the Appellant's saliva.

The Appellant contends that the victim's trial testimony was inconsistent with her statements to the social worker and Ross. He specifically notes that prior to trial, the victim did not mention that the Appellant pushed her into the bedroom. Regardless, Ross explained that the staff of Our Kids would not have asked the victim where the incident occurred because it was medically irrelevant. Further, defense counsel pointed out the inconsistencies in the victim's versions of events during cross-examination and closing argument. We also note that the Appellant admitted inconsistencies between his trial testimony and his statements to Detective Tenry and acknowledged being untruthful with the detective on at least one occasion during the interview. The jury heard all of the testimony and, as was its prerogative, accredited the testimony of the State's witnesses, thereby resolving any inconsistencies in favor of the State. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000). We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that the evidence was sufficient to sustain the Appellant's convictions.

### III. Conclusion

Finding no error, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 13 -